UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SATISPIE, LLC,

                Plaintiff,

            v.

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

                Defendant.
_____

**DECISION AND ORDER**

6:17-CV-06234 EAW

## INTRODUCTION

Plaintiff SatisPie, LLC ("Plaintiff") brings this action against defendant Travelers Property Casualty Company of America ("Defendant"), alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, equitable estoppel, and negligence. (Dkt. 1-2). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 31). For the reasons that follow, the Court grants Defendant's motion with respect to the breach of contract and negligence claims, but denies the motion with respect to the breach of the implied covenant of good faith and fair dealing and equitable estoppel claims.

## BACKGROUND

### I. Factual Background

The following facts are taken from Defendant's Statement of Undisputed Material Facts (Dkt. 31-19), Plaintiff's response to Defendant's statement (Dkt. 35-1), and the

evidence submitted by the parties in support thereof. Unless otherwise noted, these facts are undisputed. As is required on a motion for summary judgment, the Court construes all evidence in the light most favorable to Plaintiff.

Plaintiff is a pie manufacturing business that sells unbaked frozen pies to commercial customers for retail sale. (Dkt. 35-4 at ¶ 2). On June 30, 2014, Defendant issued a commercial insurance policy (the "Policy") (Dkt. 31-2) on which Plaintiff was a named insured. (Dkt. 31-19 at ¶ 1; Dkt. 35-1 at ¶ 1). The Policy's effective date was from July 1, 2014, to July 1, 2015. (Dkt. 31-19 at ¶ 1; Dkt. 35-1 at ¶ 1). The Policy contains an endorsement expanding covered causes of loss to include "equipment breakdown" (Dkt. 31-2 at 72-77) (the "Equipment Breakdown Endorsement"). The Equipment Breakdown Endorsement contains a $25,000 limitation for property damage caused by ammonia contamination. (*Id.* at 74, 77) (indicating that "[t]he most [Defendant] will pay for loss or damage to property caused by ammonia contamination that directly results from a Breakdown to Covered Equipment" is $25,000).

On March 28, 2015, Plaintiff experienced an ammonia leak inside its cold-storage area within its insured premises. (Dkt. 31-19 at ¶ 5; Dkt. 35-1 at ¶ 5). At the time of the ammonia leak, Plaintiff was storing both finished frozen pies and frozen raw materials in the cold-storage area. (Dkt. 31-9 at ¶ 6; Dkt. 35-1 at ¶ 6).

After the ammonia leak was discovered, Plaintiff's President and Chief Executive Officer Michael Pinkowski ("Pinkowski") contacted Sarah Viksjo ("Viksjo"), an employee of his insurance broker. (Dkt. 31-9 at ¶ 7; Dkt. 35-1 at ¶ 7). Pinkowski informed Viksjo

that there had been a "major ammonia leak" with a "likely total loss on all product in the storage freezer" and asked her to alert Defendant. (Dkt. 31-9 at ¶¶ 8-9; Dkt. 35-1 at ¶¶ 8-9).

On March 29, 2015, Scott Rempel ("Rempel"), an employee of Defendant, had a phone call with Pinkowski in which Pinkowski reported the ammonia leak and indicated that "the contents of the freezer were contaminated." (Dkt. 31-14 at 1). Pinkowski estimated that the contents of the freezer were worth "700-800k at cost" and reported that he had "a lead on possible salvage to a dog food manufacturer." (*Id.*). Rempel advised Pinkowski that an adjuster would be assigned and would call to set up an appointment and that no coverage could be assessed until the adjuster inspected the loss. (*Id.*).

On March 30, 2015, Viksjo informed Pinkowski via e-mail that she had received verbal communication from Defendant that Plaintiff could "dispose of the contaminated products." (Dkt. 31-9 at ¶¶ 10-11; Dkt. 35-1 at ¶¶ 10-11). Later that day, Pinkowski sent an email to Defendant indicating that it had arranged for Waste Management to come the following Tuesday "with trailers to haul everything to [the] dump" and that employees would be instructed to "remove damaged products and load aboard WM Trailers." (Dkt. 31-9 at ¶ 12; Dkt. 35-1 at ¶ 12).

On March 31, 2015, Brian Fischer ("Fischer"), a Senior Risk Control Consultant from Defendant's boiler machinery division, visited the insured premises to inspect the damaged mechanical equipment in the cold-storage area. Plaintiff denies having known that Fischer's inspection was limited and maintains that it understood that Fischer was

investigating the entire loss. (Dkt. 31-9 at ¶ 13; Dkt. 35-1 at ¶ 13). Fischer did not inspect or test any of the frozen pies or raw materials in the cold-storage area for ammonia contamination. (Dkt. 31-9 at ¶ 14; Dkt. 35-1 at ¶ 14). Plaintiff also never tested the frozen pies or raw materials prior to disposal. (Dkt. 31-9 at ¶ 15; Dkt. 35-1 at ¶ 15).

At his deposition, Pinkowski testified that Fischer told him to "dispose of the product in accordance with the instructions" from Defendant as communicated by Viksjo. (Dkt. 31-5 at 87). Pinkowski could not recall who initially brought up the topic of disposing the product, but stated that it was "definitely discussed" and that he definitely remembered Fischer saying to dispose of the product. (*Id*. at 88). Pinkowski also testified at his deposition that he did not realize the Policy had a $25,000 limit for ammonia contamination. (*Id.* at 91-92). Fischer recorded in his claim investigation report that "the damaged product has to be moved out and disposed of so that the area around the affected evaporator can be accessed to complete the repair." (Dkt. 35-3 at 44).

It is unclear when disposal of the products began—Pinkowski was unable to recall at his deposition whether it was March 31st or April 1st. (Dkt. 31-5 at 81, 86). Fischer's claim investigation report indicates that the removal had not begun when he performed his inspection. (Dkt. 35-3 at 44). Pinkowski testified that Waste Management took away two truckloads of the product, amounting to one to two percent of what was in the cold-storage area, and that "based on the fact that it wasn't contaminated or poisonous," Plaintiff "then called . . . Baskin Livestock for them to haul it away to turn it into animal feed." (*Id*. at 79-80). Pinkowski further testified that "given that it was still edible, we saw no reason to fill

the landfill when it can be turned into animal feed." (*Id*. at 80). Pinkowski contacted Waste Management and Baskin before Fischer arrived to perform his inspection. (Dkt. 31-9 at ¶ 17; Dkt. 35-1 at ¶ 17).

Defendant opened two claims related to the ammonia leak: claim number E2L9314 related to the loss of Plaintiff's pie products; and claim number EXD1745 related to the equipment breakdown. (Dkt. 31-12 at 13-14). On April 28, 2015, Defendant denied claim number E2L9314 (the pie product claim) on the basis of the Policy's exclusion for losses caused by food spoilage. (Dkt. 35-4 at 47-48). On the equipment breakdown claim, Defendant paid Plaintiff $25,000 for damaged inventory and $58,616.65 for lost business income. (Dkt. 31-19 at ¶¶ 22-23; Dkt. 35-1 at ¶¶ 22-23).

## II.     **Procedural Background**

Plaintiff originally commenced this action in New York State Supreme Court, Monroe County; it was removed to this Court on April 13, 2017. (Dkt. 1). On April 20, 2017, Defendant filed a motion to dismiss for failure to state a claim. (Dkt. 5). The Court subsequently granted the motion to dismiss with respect to Plaintiff's claim for promissory estoppel, but otherwise denied it. (Dkt. 11).

Discovery closed on July 1, 2019. (Dkt. 30). Defendant filed the instant motion for summary judgment on July 31, 2019. (Dkt. 31). Plaintiff filed its response on October 2,

2019 (Dkt. 35), and Defendant filed a reply on October 31, 2019 (Dkt. 38). Oral argument was held telephonically on March 16, 2020[1], and the Court reserved decision. (Dkt. 45).

## DISCUSSION

**I.** **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103

---

[1] The oral argument was originally scheduled to occur in person, but was converted to a telephonic appearance in light of the public health emergency caused by the COVID-19 pandemic, as discussed more fully in the General Orders regarding Court Operations Under the Exigent Circumstances Created by COVID-19 signed by Chief Judge Frank P. Geraci, Jr. on March 13 and 18, 2020. (*See* Dkt. 43; Dkt. 44).

(W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II. <u>Breach of Contract</u>

Defendant seeks summary judgment as to Plaintiff's claim for breach of contract. The parties agree, and the Court held in connection with the motion to dismiss, that New York law applies to this diversity action. (*See* Dkt. 31-18 at 14).

"Under New York law, a breach of contract claim has four elements: '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Acquest Holdings, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 217 F. Supp. 3d 678, 686 (W.D.N.Y. 2016) (quoting *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)). Defendant argues in its moving papers that Plaintiff cannot maintain a breach of contract claim because, under the clear terms of the Policy and the

Equipment Breakdown Endorsement, damages to property caused by ammonia contamination are subject to a $25,000 limit. (Dkt. 31-18 at 15-17). In its response, Plaintiff does not dispute that there was a $25,000 limit for damages caused by ammonia contamination. Instead, Plaintiff argues that Defendant did not deny coverage for the pie loss based on the ammonia contamination limit, but instead denied it on the basis that the Policy contained an exclusion for food spoilage. (Dkt. 35 at 11). Plaintiff further argues that the evidence of record demonstrates that the pies in question were not spoiled and were still frozen at the time of disposal. (*Id.* at 13).

The Court agrees with Defendant that Plaintiff cannot demonstrate a breach of contract under the circumstances of this case. To the extent the pies in question were contaminated by the ammonia leak, it is clear that the Policy entitled Plaintiff to recover only $25,000. Plaintiff does not dispute this point in its papers, and Plaintiff's counsel confirmed at oral argument that Plaintiff was not contesting that if the pies were rendered unfit for human consumption by the ammonia leak, the $25,000 limit would apply. Instead, Plaintiff argues that the $25,000 limit is a red herring because the pies were not contaminated by ammonia and were in fact still fully edible. (*See* Dkt. 35 at 17 ("SatisPie's expert . . . is of the opinion that the shrink-wrapped and sealed boxed pies . . . were never damaged.")).

Plaintiff's argument is logically inconsistent and proves too much. Accepting Plaintiff's position that the pies were not damaged by the ammonia leak and were instead fully intact and edible when Plaintiff disposed of them, Plaintiff cannot show that it

suffered a loss that is covered by the Policy. The Policy covers "direct physical loss of or damage to Covered Property" from a "Covered Cause of Loss." (Dkt. 31-2 at 19). "Covered Cause of Loss" is further defined as "risks of direct physical loss," unless subject to an exclusion or limitation. (*Id*. at 36).

"It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Group, Inc. v. New England Ins. Co*., 225 F.3d 270, 276 (2d Cir. 2000). This is true even for "all-risk" policies—"labeling the policy as 'all-risk' does not relieve the insured of its initial burden of demonstrating a covered loss under the terms of the policy." *Roundabout Theatre Co. v. Cont'l Cas. Co.,* 302 A.D.2d 1, 6 (1st Dept. 2002). Under New York law, the phrase "risks of direct physical loss" has been interpreted to mean "some form of actual, physical damage" to the insured property. *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014). In this case, it is Plaintiff's position that there was no physical damage to its pies. (*See* Dkt. 35-4 at ¶ 34, ¶ 36 (statements by Michael Pinkowski that "I can definitively say that none of the pies or pie product that were in the freezer ever spoiled" and "the pie product was perfectly edible"))[2]. Accordingly, Plaintiff cannot show that coverage under the Policy was ever triggered, and therefore also cannot show any breach by Defendant in failing to pay. In other words,

---

[2] It is unclear to the Court how Plaintiff's current position is consistent with it having accepted a $25,000 payment for damaged inventory as a result of the ammonia leak. However, Defendant has not raised this argument.

according to Plaintiff's logic, the loss was caused by its disposal of product that was not contaminated—but if that is the case, it constitutes a loss that is not covered by the Policy.

Plaintiff argues that Defendant denied coverage on the pie loss claim due to the Policy's exclusion for food spoilage and that it cannot now "change horses in midstream" and argue that a different exclusion applies. (*See* Dkt. 35 at 16-17). However, the New York Court of Appeals has held that "a disclaimer of liability, based on specified exclusions . . ., does not effect a waiver of an insurer's defense (in other words, no preclusion obtains) that the claim was outside the scope of the insuring clause of the policy." *Cent. Gen. Hosp. v. Chubb Grp. of Ins. Companies*, 90 N.Y.2d 195, 201 (1997). In other words, Defendant's reliance on the food spoilage exclusion to deny Plaintiff's claim does not now prevent it from arguing that if, as Plaintiff maintains, the pies were not damaged when Plaintiff disposed of them, coverage was never triggered in the first instance.

In sum, there are two possible scenarios presented by the record: (1) Plaintiff's pies were rendered unfit for human consumption by ammonia and the $25,000 limit applies; or (2) the pies were, as Plaintiff claims, undamaged, and no covered loss occurred. Under either set of facts, Defendant has not failed to comply with its contractual obligations. For these reasons, the Court agrees with Defendant that no reasonable jury could find for Plaintiff on its express breach of contract claim. Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's claim that Defendant breached the express terms of the party's contract.

## III. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff has also asserted a claim for breach of the implied covenant of good faith and fair dealing. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)). In other words, the covenant of good faith and fair dealing "is breached when a party acts in a manner that, *although not expressly forbidden by any contractual provision*, would deprive the other party of the right to receive the benefits under the agreement." *Williamson Acquisition, Inc. v. PNC Equity Mgmt. Corp.*, Nos. 03-CV-6666T, 04-CV-6259T, 2010 WL 276199, at *7 (W.D.N.Y. Jan. 15, 2010) (quoting *Skillgames LLC v. Brody*, 1 A.D.3d 247, 252 (1st Dept. 2003) (emphasis added)), *aff'd sub nom. Argilus, LLC v. PNC Fin. Servs. Grp., Inc.*, 419 F. App'x 115 (2d Cir. 2011). "As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194 (2008) (quotation omitted). Breach of the implied duty of good faith and fair dealing constitutes "a breach of the underlying contract." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *see also Fishoff*, 634 F.3d at 653 ("A breach of the duty of good faith and fair dealing is considered a breach of contract.").

As an initial matter, the Court notes that Defendant has cited several cases dealing with a bad faith refusal by an insurer to pay benefits. (*See* Dkt. 31-18 at 22-25). However, the implied covenant of good faith and fair dealing extends beyond this context. *See Schmid v. Allstate Ins. Co.*, No. 15-CV-9657 (CS), 2017 WL 6994547, at *8 (S.D.N.Y. Mar. 10, 2017) ("[T]o state a claim for breach of the implied covenant of good faith and fair dealing under New York law, Plaintiff must show (1) fraud, (2) malice, (3) bad faith, (4) other intentional wrongdoing, or (5) reckless indifference to the rights of others such as gross negligence." (quotation omitted)). Actual "bad faith" is required only where an insured seeks to recover "in excess of the policy limits for the breach of an insurance contract." *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, No. 13 CIV. 2291 RWS, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) (quotation omitted), *aff'd*, 581 F. App'x 49 (2d Cir. 2014); *see also Bartlett v. Nationwide Mut. Fire Ins. Co.*, No. 12-CV-435-A, 2013 WL 623497, at *3 (W.D.N.Y. Feb. 19, 2013) ("New York law does recognize a cause of action for an insurer's extra-contractual bad faith upon well-pleaded allegations that: (1) the insurer denied coverage as a result of 'gross negligence'; and (2) the insurer lacked even an 'arguable' basis for denying coverage under the standards of a reasonable insurer."). Here, the record before the Court does not establish that Plaintiff seeks damages in excess of the Policy's limit.[3] Accordingly, Defendant has not demonstrated that Plaintiff must demonstrate actual bad faith to recover on its implied covenant claim.

---

[3] The Policy has a limit of $10,167,000.00 for "Building(s) and . . . Business Personal Property." (Dkt. 31-2 at 12).

The Court further finds that there are genuine issues of material fact regarding whether Defendant breached the implied covenant of good faith and fair dealing. As noted above, in the context of insurance contracts, the implied covenant encompasses a duty to investigate claims in good faith. In this case, construing the evidence in the light most favorable to Plaintiff, Defendant (through its employee Rempel) told Plaintiff that it would send out an adjuster to inspect the damage (including the damage to the pie products) but then never did so. Instead, it sent out Fischer, who did not inspect the pies but nonetheless told Plaintiff to proceed with disposing of them so that the equipment could be repaired.

The Court agrees with Defendant that the evidence of record demonstrates that Defendant and its agents told Plaintiff only to dispose of contaminated product. In particular, the Court notes that the email from Viksjo states that Defendant had confirmed that Plaintiff could dispose of <u>contaminated</u> products. (Dkt. 31-9 at ¶¶ 10-11; Dkt. 35-1 at ¶¶ 10-11). Pinkowski's follow-up email to Defendant stated that Plaintiff's employees would "remove damaged products." (Dkt. 31-9 at ¶ 12; Dkt. 35-1 at ¶ 12). Further, Fischer's claim investigation report refers to removal of "damaged product." (Dkt. 35-3 at 44). However, these facts are not determinative, because there still remains an open question as to whether Defendant, through its conduct, caused Plaintiff to believe that it conducted an investigation and determined that the pies and product were contaminated and should be destroyed. Regardless of the Court's views as to how a jury will likely answer that question, it must resolve that disputed issue of fact in Plaintiff's favor. *See Medeiros v. Pratt & Whitney Power Sys., Inc.*, 272 F. App'x 78, 80 (2d Cir. 2008) ("On a

motion for summary judgment, a district court must consider the evidence in the context of whether any reasonable finder of fact—not merely the district court itself—could return a verdict in favor of the non-moving party.").

"[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 99 (2d Cir. 2007) (citation omitted). In this case, the Court cannot determine as a matter of law that Defendant's purported failure to appropriately investigate Plaintiff's claim, including by not inspecting the pies, did not breach the implied covenant. *See Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 992 F. Supp. 278, 285 (S.D.N.Y. 1998) ("[A]n insurer's failure to investigate a claim reasonably can amount to a breach of the implied duty of good faith under New York law."). Accordingly, Defendant's motion for summary judgment is denied with respect to this claim.

## IV. Equitable Estoppel Claim

The Court next considers Plaintiff's claim for equitable estoppel. Under New York law, a party asserting an equitable estoppel claim must establish:

> (1) [c]onduct which amounts to a false representation or concealment of material facts . . . which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive of the real facts.

*Brelsford v. USAA*, 289 A.D.2d 847, 849 (3d Dept. 2001) (alterations in original) (internal

quotation marks omitted); *see also In re Vebeliunas*, 332 F.3d 85, 94 (2d Cir. 2003) (same). "The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *In re Vebeliunas*, 332 F.3d at 94.

The Court finds that there are genuine issues of material fact regarding Plaintiff's equitable estoppel claim. As discussed above, a reasonable factfinder who considered all evidence in the light most favorable to Plaintiff could conclude that Defendant's conduct misled Plaintiff into thinking that Defendant had inspected the pies and concluded that they were contaminated. There is also evidence to support the conclusion that Defendant's agent Fischer knew that he had not inspected the pies, yet nonetheless communicated that Plaintiff should move forward with disposing of them so that repair of the damaged equipment could begin. A reasonable factfinder could further conclude that Plaintiff then detrimentally changed its position, in reliance on Defendant's actions, by disposing of the pie products. By no means is the Court suggesting that this is a likely outcome—particularly since evidence in the record exists supporting the conclusion that Plaintiff intended to dispose of the pie product prior to the visit from Fischer—but on this record, Defendant has not demonstrated that it is entitled to judgment as a matter of law on Plaintiff's equitable estoppel claim.

## IV. Negligence Claim

Finally, the Court considers Plaintiff's negligence claim. "Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. Such a legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (citations and quotations omitted).

The Court agrees with Defendant that Plaintiff cannot establish the existence of a duty outside the contract in this case. The only duty suggested by Plaintiff is a duty to have tested the pie products before "directing and ordering that they be disposed of by [Plaintiff]." (Dkt. 31-18 at 26 (quoting Dkt. 1-2 at ¶ 41)). However, as discussed above, under New York law, the duty to perform a good faith investigation into claims is inherent in an insurance contact. *See Those Certain Underwriters at Lloyds, London v. Gray*, 49 A.D.3d 1, 4 (1st Dept. 2007) (noting that insurer has the obligation to conduct a prompt, diligent investigation into claims). Thus, Defendant's alleged duty to inspect the pie products is not separate from its contractual obligations. There is no evidence in the record before the Court to support a finding of any other independent duty by Defendant. Accordingly, the Court grants Defendant's motion with respect to Plaintiff's negligence claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 31) is granted as to Plaintiff's claims for express breach of contract and negligence and denied as to Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and equitable estoppel.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: March 25, 2020
      Rochester, New York